Milton Albert, J.
The title of this claim was amended at the trial with the approval of the court by the addition of “ , and Michael Gordon ” at the end thereof, he having attained the age of 21 on April 18, 1968, which was before the date of the trial.
In 1965 Michael Gordon was a student at Oneonta State College at Oneonta, New York, an institution of the State University of New York.
In the furtherance of his academic studies, he enrolled in a course in European History conducted by a Professor Maher. Field trips were recognized by the college authorities as proper for academic courses and on such trips students could be excused from their other classes and granted attendance and study credit for the days involved.
Such a field trip, a visit to the Cloisters Museum in New York City, was discussed and planned by Professor Maher and the students of his European History class. The date, expenses and mode of transportation were discussed. The professor advised the appropriate college authorities of the proposed trip, submitted the necessary form for approval and was granted a $25 expense allowance by the college.
The head of the Social Science Department testified that there was a college policy and regulation in the faculty handbook to the effect that only means of public transportation could be used on field trips. Professor Maher apparently knew of the existence of this rule, but apparently not known by his students — at least not by Michael Gordon.
The initial discussion between Professor Maher and his students was to the effect that he would look into the possibility and costs of public transportation, that the college would pay *733 the transportation and overnight lodging expenses of the students, but that the students would have to pay for their meals and incidental expenses. As a matter of fact, testimony by the head of the department was to the effect that the college would pay no part of the expenses of the students but only of the professor.
As the plans for the trip progressed, Professor Maher advised his students that public transportation would be too costly and asked whether any of the students had personal automobiles that could be used. One student offered his car. Since approximately seven were to make the trip, this would be insufficient. Accordingly, Professor Maher offered his wife’s 1958 Volkswagen as the second car and asked if any of the students could drive it. Michael Gordon had some experience in driving a Volkswagen the previous summer and so he volunteered. The plans were then finalized between the professor and his students whereby the two cars would be used with Michael Gordon to drive the Volkswagen.
Professor Maher advised the college authorities in writing, a few days before the trip, that the trip was to be made by public transportation and also listed the names of the students who were to go and thus be excused from other classes. The trip was duly approved and credit and time attendance allowed to the students in question.
On October 29,1965, the field trip began at 9:00 a.m. Michael Gordon drove the Volkswagen as planned, with the professor and two other students as passengers. They proceeded south on Route 28 toward Walton, New York, some 30 miles away. During the course of this part of the trip there was trouble with the heater of the Volkswagen — when the heater was turned on smoke and leaves came out of it — and it was turned off and not used until the party later left Monticello. In addition, the front wheels “ vibrated ”, as described by Michael Gordon. The court interprets this to mean that the front wheels ‘ ‘ shimmied ’ ’. The field trip party stopped at Walton for breakfast and the Volkswagen was taken to a Pontiac body shop where a mechanic was asked to check the heater and wheels. This mechanic advised them to have a Volkswagen mechanic check the car, the nearest one being in Oneonta. Michael Gordon testified that he asked Professor Maher to go back, but that the professor said that there had been similar trouble in the past with the front wheels and that it would straighten out as it had done in the past. Before the party left Walton, one of the students who had been riding in the Volkswagen transferred to the *734 other car. This may have been because of the lack of heat in the Volkswagen or because of the shimmying, or both.
The field trip party then continued on toAvard Route 17 — the Quickway. There was further trouble with the front wheels and another stop was made at Roscoe, New York, where Professor Maher took off the front hubcaps and checked the wheel lugs and found nothing wrong. There was further checking as the trip proceeded with Michael Gordon suggesting that they turn back or that they check with a Volkswagen mechanic, and with the professor assuring him that it would straighten out as it had in the past.
The group stopped in Monticello, New York, for lunch. After lunch the field trip party continued on the Quickway toward New York City with the heater on and with front wheel shimmying being experienced from time to time. Michael Gordon testified that when they left Monticello, Professor Maher sat next to him on the front seat and went to sleep.
On one of the stops, gasoline was purchased for both cars by Professor Maher.
Near MiddletoAvn, the Volkswagen hit a seam in the highway surface and veered toward the right. This was at a location in the road where the highway route doglegged toward the left. The right front wheel went onto the right shoulder. Michael brought the automobile back onto the paved surface by turning toward the left. Then, he testified, he could not get the automobile to stay on the paved surface. Despite his efforts, it continued toward the left and went across the paved area into the center mall and overturned. As the result of this accident Michael Gordon sustained the physical injuries that gave rise to this claim.
At the time of the occurrence, Michael Gordon was a minor, both of whose parents were dead. He lived with his older brother, Charles, who later was appointed his general guardian. Thus, the claim was brought by Charles Gordon as general guardian and on behalf of Michael. 'Charles Gordon testified that Michael lived with him and that he paid all of Michael’s expenses and that he paid expenses that were incurred as a result of the accident. As indicated above, at the time of the trial, Michael had reached his majority and the title of the claim was amended to reflect such change.
Notice of intention to file a claim was timely filed with the Clerk of the Court of Claims on January 27,1966 and the actual claim was timely filed with such clerk on January 4, 1967.
The claim has not been assigned nor submitted to any other court for hearing or determination.
*735 The claim alleges that Michael Gordon was taken on the trip without permission, consent or authorization of his guardian, that proper transportation was not provided and that he was injured as the result of the negligence of the State, its agents and employees in failing to properly supervise him while a student at Oneonta, and that mechanical difficulties were encountered on the trip, but that Professor Maher directed him to proceed.
After the accident occurred Michael Gordon was taken to a hospital in Middletown where, he testified, he became conscious while needles were being stuck into his head — apparently while drugs were being injected. He remained in the hospital for 10 days. He was attended by a Dr. Morreale, a surgeon, who brought in two consultants — Dr. Ralston, a neurologist, and Dr. Mermell, an ophthalmologist. For the purposes of this claim, it is sufficient to state that Dr. Morreale testified to the effect that Michael Gordon sustained a head concussion and facial and head lacerations which were sutured but that he did not sustain any brain injuries. Dr. Morreale had the benefit of a follow-up examination of Michael the day before he testified and his testimony was to this effect, notwithstanding that Michael had testified that he had headaches while in the hospital and had headaches on occasion since leaving the hospital. Dr. Morreale also testified with respect to the cost of corrective plastic surgery and gave the following estimate based upon rates in the Middletown area — surgeon $500, hospital room $280-350, operating room fees $100, laboratory work $25 — which the court approximates at a total of $1,000 — if done in the Middletown area.
At this point, it is noted that Michael Gordon did not return to college for the remainder of the fall semester but did return around February 1, 1966 for the spring semester and resumed his studies. A portion of the claim is for nonreimbursed tuition and other college charges in the amount of $383.43. Dr. Morreale’s bill for services was $180, Dr. Ralston’s bill was $40, Dr. Mermell’s bill was $15 and the hospital bill was $448.98 (this included $2.98 for phone charges).
Michael Gordon made up the time lost by attending summer school and by taking extra courses during regular semesters and has been making a good adjustment. He has been doing instructional work at the college and was married on October 12,1967. He added that he plans to become a college professor. Nevertheless, he testified that when he experiences his headaches, they can only be handled by rest, sleep and use of tranquilizers.
*736 With respect to the front wheel condition of the Volkswagen, claimants called as a witness Mr. Ahe Greenspan of Middletown, New York, who was the owner and operator of the Volkswagen agency there. It was his agency which removed the Volkswagen from the mall where it turned over. He testified that he was asked to make an appraisal of it for valuation and salvage purposes and that he valued the same at $50 after having made a general inspection of the car. His records showed that he found the engine to be in poor condition, the front end in poor condition, the tires good, and the body a total loss.
With respect to the front end condition, Mr. Greenspan testified that on the basis of his inspection, the link pins and king pins were excessively worn, that they were worn in excess of State inspection requirements, and that to his knowledge the automobile had no State inspection certificate. He eventually testified that this worn condition could have been the cause of the accident. It was his further opinion that the condition existed before the accident, that it was a wear and tear condition, and that it was not the result of the accident. It was his further testimony that worn king pins could cause a shimmying condition of the front wheels when they hit an obstruction on a road, that such wheels would not shimmy while driving smoothly and that this was what apparently occurred in this case. He described his examination as a rocking of the front end and testified that a trained person by doing so could determine whether king pins or link pins were worn. He stated that he did this by experience and that he did not take off the wheels to actually ascertain whether his diagnosis was correct. He stated further that in his business this is an accepted method for checking front ends, except where a repair estimate was wanted. He testified that he had informed Mr. Gordon or his representatives of his findings.
After testimony by Michael Gordon, Dr. Morreale and Mr. Greenspan, Charles Gordon testified that he had been appointed general guardian of Michael on March 28, 1966 since Michael’s mother and father had both passed away; that Michael lived with him and that he paid all of Michael’s expenses out of his own pocket.
It is noted at this point that the State did not call any witness to controvert Michael Gordon’s testimony concerning the details and arrangements of the trip or Mr. Greenspan’s testimony concerning the condition of the Volkswagen. With respect to the former, it is . noted that Professor Maher was not called to testify nor any of the students who were also on the trip. With respect to the condition of the automobile, Mr. Greenspan testi *737 fied that he had sold it only a year ago. Therefore, it was in his possession for about a year and a half after the accident. Yet, the State produced no one to testify as to the actual condition of the front end or to the effect that an effort was made to inspect the front end but that permission was refused.
With respect to Michael Gordon’s injuries, there were scars of four surface injuries: —
1. On the bridge of his nose, which was not clearly visible at the time of trial.
2. On the cheek under the eye, of about %-% of an inch, which was not clearly visible at the time of trial.
3. Above the right eye in the form of three quarters of a circle. This was more than an inch in total length with a bulbous area in the center and clearly a situation which the court believes should be corrected by plastic surgery.
4. Above the third, on the top of the forehead along the hairline and into the hair in the form of a left 90 degree angle, with a total length of 3% inches and with a visible portion of about 1% inches. This, too, the court believes should be corrected by plastic surgery.
Michael Gordon testified that at times he feels pressure along the seam of the fourth scar and that these pressure periods have been more frequent in recent times.
The State called two witnesses. Dr. William B. Fink, head of the Social Science Department, who had jurisdiction over Professor Maher in a general way. Dr. Fink testified that he had approved the field trip and that the college rule and policy, as set forth in the faculty handbook, was that field trips had to be by public transportation and also that the college did not pay any student field trip expenses but did in this case provide $25 for Professor Maher’s expenses. He also testified that Professor Maher was no longer associated with the college. The court notes that the actual text of the college rule or policy, as set forth in the faculty handbook, was not offered in evidence.
The State’s second witness was Dr. Robert John Aquilina, a neurologist and neurosurgeon, who examined Michael Gordon two days before he gave his testimony. It was this specialist’s opinion that Michael had suffered a concussion but that he had not suffered any brain injury by way of scarring or laceration of the brain. He stated that if such brain injury had occurred Michael would have been a much sicker patient than he had been in the hospital.
With respect to Michael’s headaches, it was Dr. Aquilina’s opinion that, if they were related to the accident, they would eventually cease.
*738 The court finds that the shimmying condition was known to Professor Maher, that such condition caused the accident and was thus the proximate cause of Michael Gordon’s injuries, and that Professor Maher failed in his duty to provide reasonable care to his student and that he was, therefore, negligent. This was made apparent by his disregard of the shimmying condition as it recurred during the trip and his insistence that the trip continue despite Michael Gordon’s pleas to him. The court notes that this young college student was directly under the guidance and supervision of his professor and that he tried to persuade his professor to turn back or to have the car repaired before going further but was in no position to overrule his professor, nor to insist that the field trip party all return, nor was he in a position to abandon the party and refuse to drive. The court finds that Michael did all that he could reasonably do under the circumstances and that he was not contributorily negligent in his conduct before the time when the accident happened and that he was not contributorily negligent in the handling of the automobile at the time of the accident. Bather, the court finds that Professor Maher took charge of the situation in his direction that the field trip party continue forward and that the automobile’s front wheel shimmying would straighten out. Thus, he assumed control and direction of the situation and responsibility for what happened (Verduce v. Board of Higher Educ., 8 N Y 2d 928; Broderick v. Cauldwell-Wingate Co., 301 N. Y. 182; Lesniak v. State of New York, Claim No. 45634).
With respect to whether the negligence of Professor Maher is attributable to his employer, the State of New York, under the doctrine of respondeat superior, the court finds that field trips in general and this one in particular were an accepted part of the educational program of the college and that the conduct of this field trip was most certainly within the scope of the professor’s employment. Michael Gordon, not knowing of the faculty handbook policy or regulation and considering his relationship to his professor, was obliged to accept as authorized and correct the professor’s arrangements for the field trip and to rely upon them. The professor’s deviation from public transportation to the private form, the court finds was still in furtherance of the educational program of the college and was not a u frolic or detour ” of a personal type by the professor. Accordingly, the court finds that the accident occurred while the students were engaged on an authorized field trip and while the professor was acting within the scope of his employment and while on the master’s work or duty even though he deviated *739 from the policy or regulation of the college. The method of accomplishing the trip was reasonably adapted to and was not a sufficient deviation to take the act without the scope of the professor’s employment. The court, accordingly, finds that the professor’s negligence is imputable to his employer under the doctrine of respondeat superior (Burmaster v. State of New York, 7 N Y 2d 65; Brown v. Town of Bolton, 19 A D 2d 668; Bluestein v. Scoparino, 277 App. Div. 534; O’Loughlin v. Mackey, 182 App. Div. 637).
The court finds that Charles Gordon, Michael’s guardian at the time of the accident, stood in the position of in loco parentis to his brother and that in such capacity he paid:
a. Medical expenses incurred on behalf of his brother in the sum of $681 — being $180 for the reasonable and fair services rendered by Dr. Morreale, $15 for Dr. Mermell, $40 for Dr. Ralston and $446 for hospital charges (less $2.98 for phone charges) and
b. College tuition, room and board, charges for the 1965 fall term that were not refunded and unused hook bills in a total claimed of $383.43. The total of these medical, unrefunded school charges and unused book bills are awarded to him; namely, $1,064.43.
With respect to Michael Gordon, the court finds that by reason of his pain and suffering and for his residual scarring, which will require future plastic surgery, Michael Gordon has been damaged in the sum of $10,000 and the court hereby awards such amount to him.
The State’s motions to dismiss the claim based on nonliability arguments are now denied.